## WYMAN *v.* DONNELLY.

---

PATENTS; INTERFERENCE; PRIORITY OF INVENTION; REDUCTION TO PRACTICE; EVIDENCE; SHOP TEST; DILIGENCE.

1. Where after making and testing one form of ejecting mechanism for match machines, one of the parties to an interference made an improved form and showed the second form in his application, but made broad claims including the first form, it was *held* that the first machine was a reduction to practice.

2. Where mechanism for ejecting match splints from the carrier was placed upon a full-sized match machine and tested in the inventor's shop in ejecting dummy matches, real matches not being used because of danger of fire, the shop not being designed for manufacturing purposes, and found to be successful, it was *held* to be reduction to practice.

3. Where one of the parties to an interference involving the ejecting mechanism of a match machine, was not a match manufacturer, but a manufacturer of machines, it was *held* that his failure to test his device with real matches instead of dummy matches, and his failure to use his machine commercially, could not be taken as discrediting his claim that the machine was successfully reduced to practice.

4. Where the issue in an interference proceeding related to ejecting mechanism of a match machine and the device introduced in

evidence was merely the ejecting mechanism, but the testimony was that it was used on a full-sized match machine, the inference that the machine included all of the parts usual in such machines was *held* to be a proper one.

5. Where the senior party to an interference conceived his invention in 1897, but did not file his application until April, 1899, and in the interval did nothing except to make a few efforts to enlist capital, although able to file an application at any time and with some experience in proceedings to obtain a patent, and the testimony tended to show that there was some underlying motive for his delay, it was *held* that lack of means to build a complete machine and efforts to enlist capital did not constitute sufficient excuse for his delay, and entitle him to an award of priority over his rival who conceived the invention in May, 1898, and reduced to practice a few months thereafter.

No. 214.   Patent Appeals.   Submitted November 19, 1902.   Decided January 20, 1903.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.        *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. C. T. Benedict, Mr. Arthur L. Morsell,* and *Mr. Walter H. Chamberlin* for the appellant.

*Mr. John R. Nolan* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents in an interference proceeding having the following issue:

" In a match-machine the combination of a continuously-moving match-carrier comprising integral perforated sections, means carrying devices for engaging the matches to remove them from the carrier and means for giving said first-mentioned means a reciprocating movement in the direction of motion of the carrier and back again substantially as and for the purpose described."

The parties are independent inventors and there is no conflict of evidence as regards their respective labor in the field

of invention. William H. Wyman is the senior party under an application dated April 3, 1899. Joseph C. Donnelly's application was filed April 7, 1900.

The evidence makes it clear that Wyman conceived the invention of the issue in 1894, made drawings and explained it to others, though he did not reduce it to practice by the construction and operation of a machine until July 25, 1900. He has the benefit, however, of constructive reduction on his application filed more than a year before.

Donnelly's claim of conception is laid in May, 1898, and the proof is clear that he completed a device for ejecting the match-splints as early as June 7, 1898. That machine was then and there operated with match-splints and ejected them in a satisfactory manner. It was similarly tested from time to time thereafter in the presence of different persons and found to operate successfully. It was kept in Donnelly's shop completely organized and has been made an exhibit in the case, referred to as " Exhibit Ejecting Mechanism." It shows a plate provided with parallel rows of perforations for the insertion of matches, a pivotally-mounted cross-head provided on its lower side with a series of punches corresponding with the perforations in the plate. The cross-head, in descending, rocks upon the pivot so that the part carrying the punches moves in the same direction and at the same speed as the continuously-moving carrier, and at the same time the punches operate to eject the matches from the corresponding perforations in the carrier-plate; the ascending plate returns to its original position for the repetition of its action upon the succeeding row of match-holding perforations.

As has been said by the Commissioner, a match-machine is a very large structure and includes many subordinate mechanisms each of which has its own peculiar function. Such machines were then in use and were well known to inventors, machinists and manufacturers. Among these subordinate mechanisms were those whose functions are to prepare the splints, to insert them in the perforated plates of the endless carrier, to give them their several coatings and

ignitable heads, eject them from the plates, and deposit them in boxes for the market.

The carrier was of great length in order to give the matches time to dry thoroughly, after passing through the liquid-baths necessary to their completion, before deposit in the boxes. In those machines the carrier had what is called a " step-by-step " movement, due to the fact that each perforated plate was stopped temporarily as it came in contact with the ejector.    The object of the improvement in the invention of the issue was to increase the output of the machine in a given period of operation, by substituting a continuous motion for the " step-by-step " motion of the carrier.    This necessitated " carrying devices for engaging the matches to remove them from the carrier and means for giving said first-mentioned means a reciprocating movement in the direction of motion of the carrier and back again, substantially as and for the purpose described."

The aforesaid machine of Donnelly by which this object was attained is not the same specific construction that is set forth in the application for his patent and the drawings attached thereto.    Late in 1898, he planned another machine which was constructed and operated about September, 1899. This was adapted to take the place of the former construction in a complete match-machine.    Both devices operated upon a continuously-moving carrier and satisfactorily ejected the match-splints, but by a slightly differing motion.

The pivotal mounting of the cross-head of the first construction permits the oscillation of the punches in the direction of the movement of the carrier, and also a reverse oscillation back to its position for operation upon the succeeding row of perforations.    In the second construction the cross-head was provided with mechanism through which the oscillating motion was substituted by a direct vertical motion upon the splint-carrying plate; that is to say, the punches while moving with the carrier, operated vertically in the perforations, then moved straight up and then back to their original position for the repetition of the ejecting operation.

The substantial questions raised on the record are these:

First. Was the first construction of Donnelly a reduction to practice of the invention of the issue?

Second. Was Wyman, at the time of Donnelly's entry in the field, using due diligence to reduce his own and earlier conception to practice?

On both questions the decision of the examiner of interferences was in favor of Donnelly. On appeal, he was reversed by the examiners-in-chief, who held with Wyman on both propositions. On final appeal to the Commissioner the decision of the examiners-in-chief was reversed, and priority was awarded to Donnelly.

Our conclusion is, that the Commissioner did not err in holding the construction and use of the machine of June 7, 1898, a sufficient reduction to practice of the invention of the issue. The issue does not call for a particular construction, but for the combination, in a match-machine, of the continuously-moving carrier with a mechanism having a reciprocating movement as described. The oscillating movement of the first ejector in its descent to engage the matches in a continuously-moving carrier and eject them in turn as presented in such carriage, is a reciprocating movement as called for by the issue. This was clearly the idea of the examiner who framed the issue of the interference, for he included therein the applications of both Rahe and Barnes, the crossheads of whose devices as stated in the examiner's decision, have a movement of the same character. Those parties, it may be here remarked, took no evidence; they, however, cross-examined the witnesses of the two contending parties. The case presented is quite different from that in the recent case of *Blackford* v. *Wilder, ante,* p. 1, in which it was held that the reduction to practice did not embrace all the necessary elements of the combination of the issue. We agree with the Commissioner that the evidence sufficiently shows the repeated and successful trial of the machine in connection with a continuous carrier composed of perforated plates in which the match-splints had been inserted. That these insertions were by mechanism for the purpose, is fairly to be inferred from the well-known operation of such carriers, and the quantity

of splints used in the frequent trials. We regard it as a matter of no importance that Donnelly, who was a machine-builder and not a match-manufacturer, did not use the machine in the actual manufacture of matches. Nor is there anything substantial in the objection that matches were not used in the trial instead of the uncoated splints. That the machine was in the shop on the fifth floor of a building not designed for manufacturing purposes, furnishes a sufficient reason for not using actual matches in the repeated trials on account of the great danger of fire.

Danger from fire on another and special ground has been urged as a potent reason why the test was not made with matches, and, therefore, for the inference that the test was not a sufficient one to demonstrate the practical utility of the machine in manufacture. The contention is that the rocking action of the cross-head punches necessarily tends to push the matches to one side instead of straight down so that the heads would have a frequent tendency to come together with friction. To this contention the Commissioner made answer as follows:

" The rows of matches in the carrier are sufficiently far apart to prevent any such result, particularly since it is very clear that there would not be sufficient twisting action due to the pivoting of the cross-head to cause any appreciable change in the position of the matches. A shop test with dummy matches, made under all of the other conditions of actual use, is believed to be sufficient to demonstrate the practicability of the device as effectually as would use with real matches. The invention relates only to the ejecting mechanism and not to the other parts of the match-machine, and there can be no doubt, in view of the evidence, that it successfully ejected the splints."

We fail to see anything in the case that would justify us in rejecting this conclusion.

Without further discussion, our opinion is not only that the construction of Donnelly embodied the invention of the issue, but also that it was practically adapted to, and sufficiently produced, the result sought to be accomplished by it,

when the supporting evidence is tested by principles recognized and applied in analogous cases that have been heretofore decided. *Wurts* v. *Harrington,* 10 App. D. C. 149; *Mason* v. *Hepburn,* 13 App. D. C. 86; *Roe* v. *Hanson,* 19 App. D. C. 559.

The decision of the Commissioner that there was a failure of diligence on the part of Wyman is likewise sustained.

Wyman, as has been seen, filed an application on April 3, 1899, to obtain a patent for an invention conceived about five years before. He was completely satisfied as to the value and practicability of his conception of the ejecting mechanisms, and early in 1894, prepared drawings completely illustrating it.

Prior to the conception of his adversary, his efforts at reduction consisted in a few attempts to enlist the interest of men of capital in his invention, all of which were unsuccessful. During the time he had money enough to build a new house, and was employed upon a constant salary of $150 per month. He was able to make his drawings and had had some experience in proceedings to obtain a patent. Whilst it is true that he did not have the means to build a complete match-machine in order to reduce his invention to practice, it does not appear that he was unable to pay the expense of preparing and following up an application for a patent. Moreover, it is not clear that there was not some other underlying motive for his delay.

It appears that at about the time of his conception he made a contract for five years' service with the Diamond Match Company which had purchased the plant and business in which he had been interested.

While engaged with them in March, 1898, he undertook, through an attorney of Oshkosh, where he resided, to interest persons in Canada, as well as in England and France, to take up his invention and use and patent it abroad. The letters written to those persons were not preserved, but several of their replies were produced and appear in the record. In one of these, dated June 23, 1898, there appears the following sentence:

"As we read your letter, the machinery cannot be used in the United States, and it is in capacity, etc., quite equal to that in use by the Diamond Match Co."

This statement and the general efforts to exploit the invention abroad during the five years' contract with the Diamond Match Company, have some tendency to create a suspicion at least that there may have been something in his contract with that company, relating possibly to invention made during the continuance of the same, that tended to restrain him from applying for a patent in the United States until after the severance of their relations.

The contract between him and the Diamond Match Company was not produced, nor were its contents testified to. But however this may be, we cannot agree that the evidence of Wyman's financial condition, and his efforts to enlist the aid of others prior to the conception of Donnelly, constitute a sufficient excuse for his delay.    To hold otherwise would set a dangerous precedent.

For the reasons given, the decision must be affirmed.    It is so ordered, and that this decision be certified to the Commissioner of Patents.                            *Affirmed.*